**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

**CASE NO.: _____**

| | |
|---|---|
| PETER SANDSTROM and GREG MARCISZ, *on behalf of themselves and all others similarly situated*,<br><br>   Plaintiffs,<br><br>v.<br><br>HCA HEALTHCARE, INC., a Tennessee corporation,<br><br>   Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs, Peter Sandstrom and Greg Marcisz ("Plaintiff"), brings this Class Action Complaint ("Complaint") against Defendant, HCA Healthcare, Inc. ("Defendant"), as individuals and on behalf of all others similarly situated, and alleges, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

### I.   <u>INTRODUCTION</u>

1.      Plaintiffs seek monetary damages and injunctive and declaratory relief in this action, arising from Defendant's failure to safeguard the Personally Identifiable Information[1]

---

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued

("PII") and Protected Health Information ("PHI") (together, "Private Information") of the patients of hospitals and physician groups it owned or operated, which resulted in unauthorized access to its information systems in or around June 2023, and the compromised and unauthorized disclosure of that Private Information, causing widespread injury and damages to Plaintiffs and the proposed Class (defined below) members.

2.      Defendant, a Nashville, Tennessee-headquartered company, is a leading healthcare organization "comprised of 182 hospitals and 2,300+ sites of care in 20 states and the United Kingdom."[2] In addition to hospitals, Defendant operates numerous "sites of care includ[ing] surgery centers, freestanding ERs, urgent care centers, diagnostic and imaging centers, walk-in clinics and physician clinics."[3]

3.      As explained in detail herein, upon information and belief, on or before July 5, 2023, an unauthorized party obtained a vast amount of Private Information pertaining to patients from Defendant's "external storage location exclusively used to automate the formatting of email messages" (the "Data Breach").[4] This unauthorized party later posted this Private Information on an online dark web hacker forum.[5][6] The post on the dark web hacker forum boasted that this list consisted of "17 files and 27.7 million database records."[7]

4.      The Department of Health and Human Services ("HHS") has instructed health care

---

driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the subject data breach.

[2] https://hcahealthcare.com/about/ (last accessed July 14, 2023).

[3] *Id.*

[4] https://hcahealthcare.com/about/privacy-update.dot#faq7 ("HCA Healthcare Data Security Incident Report") (last accessed July 14, 2023).

[5] https://healthitsecurity.com/news/hca-healthcare-suffers-data-breach (last accessed July 11, 2023).

[6] https://www.bleepingcomputer.com/news/security/hca-confirms-breach-after-hacker-steals-data-of-11-million-patients/ (last accessed July 14, 2023).

[7] *Id.*

providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phone book because it is not related to health data, "[i]f such information was listed with health condition, *health care provision* or payment data, *such as an indication that the individual was treated at a certain clinic*, then this information would be PHI."[8]

5.      As a result of the Data Breach, the Private Information of patients at hospitals and other medical facilities owned or operated by Defendant, including Plaintiffs and the proposed Class members ("Patients"), were stolen and released on a dark web hacker forum including their names, cities, states, zip codes, email addresses, phone numbers, dates of birth, genders, patient service dates, patient service locations, and next appointment dates.[9]

6.      Defendant's own investigation concluded that the Private Information compromised in the Data Breach included Plaintiffs' and approximately 11 million other Class members' Private Information, across 27 million rows of data.[10]

7.      As a result of Defendant's failure to safeguard Plaintiffs and Class members Private Information, Plaintiffs and Class members now face a lifetime risk of identity theft due to the nature of the information lost, and a diminution in the value of their private data.

8.      Defendant's harmful conduct has injured Plaintiffs and Class members in multiple ways, including: (i) the lost or diminished value of their Private Information; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive Private Information.

---

[8] https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (emphasis added) (last accessed July 14, 2023).
[9] *Supra* n.4.
[10] *Id.*

9. On behalf of themselves and the Class preliminarily defined below, Plaintiffs bring causes of action against Defendant for negligence, negligence *per se*, invasion of privacy, breach of implied contract, unjust enrichment and violation of the California Confidentiality of Medical Information Act and seeking an award of monetary damages and injunctive and declaratory relief, resulting from Defendant's failure to adequately protect their highly sensitive Private Information.

## II. <u>PARTIES</u>

### *Plaintiff Peter Sandstrom*

10. Plaintiff Peter Sandstrom is, and at all times mentioned herein was, an individual resident and citizen of the state of Florida, and a patient of HCA Florida West Surgical Specialists, which is one of the affected facilities listed in Defendant's Data Security Incident announcement.[11]

11. Plaintiff Sandstrom provided Private Information, indirectly or directly, to Defendant on the condition that it be maintained as confidential and with the understanding that Defendant would employ reasonable safeguards to protect his Private Information.

12. If Plaintiff Sandstrom had known Defendant would not adequately protect his Private Information, he would not have allowed Defendant to maintain this sensitive Private Information.

13. As a consequence of the Data Breach, Plaintiff Sandstrom has been forced to and will continue to invest significant time monitoring his medical accounts to detect and reduce the consequences of likely identity and/or medical fraud. Given the highly-sensitive nature of the Private Information stolen, Plaintiff Sandstrom suffers present, imminent, and impending risk of injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his personal and financial information being placed in the hands of criminals.

---

[11] *See supra* n.4.

***Plaintiff Greg Marcisz***

14.     Plaintiff Greg Marcisz is, and at all times mentioned herein was, an individual resident and citizen of the state of California, and a patient of Good Samaritan Hospital in San Jose, California, which is one of the affected facilities listed in Defendant's Data Security Incident announcement.[12]

15.     Plaintiff Marcisz provided Private Information, indirectly or directly, to Defendant on the condition that it be maintained as confidential and with the understanding that Defendant would employ reasonable safeguards to protect his Private Information.

16.     If Plaintiff Marcisz had known Defendant would not adequately protect his Private Information, he would not have allowed Defendant to maintain this sensitive Private Information.

17.     As a consequence of the Data Breach, Plaintiff Marcisz has been forced to and will continue to invest significant time monitoring his medical accounts to detect and reduce the consequences of likely identity and/or medical fraud. Given the highly-sensitive nature of the Private Information stolen, Plaintiff Marcisz suffers present, imminent, and impending risk of injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his personal and financial information being placed in the hands of criminals.

***Defendant HCA Healthcare, Inc.***

18.     Defendant HCA Healthcare, Inc. is a corporation organized under the laws of Tennessee with its headquarters and principal place of business at 1 Park Plaza, Nashville, Tennessee 37203-6527.

//

//

---

[12] *See supra* n.4.

## III. JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) and (3) because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant, including Plaintiff Sandstrom and Plaintiff Marcisz.

20.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District. Defendant has sufficient contacts in Tennessee, as it conducts a significant amount of its business in the state of Tennessee.

21.    Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## IV. FACTUAL ALLEGATIONS

### *Defendant's Business*

22.    Defendant is a company headquartered in Nashville, Tennessee that owns and operates hospitals, ambulatory care centers, and physician groups in 20 U.S. states and the United Kingdom.[13]

23.    Plaintiffs and Class members are current or former patients of hospitals or physician centers owned by Defendant who provided their Private Information to Defendant.

24.    The information held by Defendant at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class members.

---

[13] *Supra* n.2.

25.     Upon information and belief, Defendant (through its providers) made promises and representations to the Patients that the Private Information collected would be kept safe and confidential, the privacy of that information would be maintained, and Defendant would delete any sensitive information after it was no longer required to maintain it.

26.     Plaintiffs and Class members provided their Private Information to Defendant (via the hospitals and physician groups Defendant owns or operates) with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

27.     Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

28.     Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class members from involuntary disclosure to third parties. Defendant has a legal duty to keep Patients' Private Information safe and confidential.

29.     Defendant had obligations under the FTC Act, common law, HIPAA, contract, industry standards, and representations made to Plaintiffs and Class members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

30.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class members' Private Information. Without the required submission of Private Information,

Defendant could not provide the services it does through the hospitals and physician groups it operates.

31. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class members' Private Information from disclosure.

***The Data Breach***

32. On or before July 5, 2023, an unauthorized third-party cybercriminal infiltrated an external storage location exclusively used to automate the formatting of email messages that Defendant uses to store sensitive personal information (including Private Information) of its patients (the "Data Breach").[14] This cybercriminal went undetected for an unknown period of time as it accessed the Private Information of Plaintiffs and Class members including patient names, cities, states, zip codes, emails, telephone numbers, dates of birth, genders, patient service dates, patient service locations, and next appointment dates.[15] During the Data Breach, the hacker acquired approximately 17 files and 27.7 million data base records from Defendant, including the Private Information of approximately 11 million patients. To make matters worse, the hacker has already posted the entire data dump that it stole from Defendant on a dark web hacking forum and is now readily available to download on the Dark Web.[16]

33. On or about July 10, 2023, Defendant posted a Data Security Incident report on its website informing Plaintiffs and Class members of the Data Breach in which their Private Information was compromised.[17]

---

[14] *Supra* n. 4.
[15] *Id.*
[16] *Supra* n. 6.
[17] *Supra* n. 4.

34. The Data Security Incident announcement on Defendant's website stated that Defendant learned of the unauthorized access and exfiltration of Plaintiffs' and Class members' Private Information on July 5, 2023 when it learned "about the unauthorized persons claims on the online forum on July 5" wherein the hacker threatened to expose this Private Information.[18][19] This means that not only did the cybercriminal view and access the Private Information without authorization, but it also removed and likely sold Plaintiffs' and Class members' Private Information. In the Data Breach, this criminal acquired the most damaging kind of Private Information that can be exposed to unauthorized third parties, including but in no way limited to personally identifiable information and sensitive medical information.

35. Due to Defendant's inadequate and insufficient data security measures, Plaintiffs and Class members now face an increased risk of fraud and identity theft and must live with that threat forever. Plaintiffs believe their Private Information was both stolen in the Data Breach and is still in the hands of the cybercriminal hackers. Plaintiffs further believe their Private Information has already been sold on the Dark Web and downloaded following the Data Breach, as that is the *modus operandi* of cybercriminals who perpetrate cyberattacks of the type that occurred here, and because the hacker group has already published this information on a dark web hacking forum.

36. Defendant had obligations to Plaintiffs and Class members to safeguard their Private Information and to protect it from unauthorized access and disclosure.

37. Plaintiffs and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

38. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches of major companies preceding the date of the Data Breach, especially data breaches affecting medical service providers.

---

[18] *Id.*
[19] *Supra* n. 6.

39.     Defendant knew or should have known that these attacks were common and foreseeable. In 2022, there were 1,802 data breaches, nearly eclipsing 2021's record wherein 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[20] The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[21]

40.     Medical services providers are among the most commonly targeted entities for data breaches. Such hacking incidents at healthcare providers have skyrocketed in the last five years as criminals demand ransoms in exchange for restoring access to sensitive medical data.[22] For example, from 2010 to 2022, federal records show that healthcare breaches have exposed approximately 385 million patient records.[23]

41.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities . . . are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[24]

42.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in the Defendant's industry, including Defendant.

***Defendant Did Not Use Reasonable Security Procedures***

43.     Despite this knowledge, Defendant did not use reasonable security procedures and

---

[20] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6 (last accessed July 14, 2023).

[21] See *Data Breaches Hit Lots More People in 2022* (Jan. 25, 2023) https://www.cnet.com/tech/services-and-software/data-breaches-hit-lots-more-people-in-2022/ (last accessed July 14, 2023).

[22] https://www.healthcaredive.com/news/cybersecurity-hacking-healthcare-breaches/643821/#:~:text=Healthcare%20breaches%20have%20exposed%20385,could%20be%20counted%20multiple%20times (last accessed July 14, 2023).

[23] *Id.*

[24] FBI, Secret Service Warn of Targeted, Law360 (Nov. 18, 2019), *available at*: https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last accessed July 14, 2023).

practices appropriate to the nature of the sensitive, non-encrypted information it was maintaining for Plaintiffs and Class members, causing Plaintiffs' and Class members' Private Information to be exposed.

44. To prevent and detect cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known

and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

45. To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- Update and patch your computer. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks;

- Use and maintain preventative software programs. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[25]

46. To prevent and detect cyber-attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

Secure internet-facing assets

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit
- Remove privileged credentials

Thoroughly investigate and remediate alerts

- Prioritize and treat commodity malware infections as potential full compromise;

---

[25] *See* Cybersecurity & Infrastructure Security Agency, *Protecting Against Ransomware* (original release date Apr. 11, 2019), *available at:* https://www.cisa.gov/news-events/news/protecting-against-ransomware (last accessed July 14, 2023).

Include IT Pros in security discussions

-    Ensure collaboration among [security operations], [security
     admins], and [information technology] admins to configure servers
     and other endpoints securely

Build credential hygiene

-    Use [multifactor authentication] or [network level authentication]
     and use strong, randomized, just-in-time local admin passwords

Apply principle of least-privilege

-    Monitor for adversarial activities
-    Hunt for brute force attempts
-    Monitor for cleanup of Event Logs
-    Analyze logon events

Harden infrastructure

-    Use Windows Defender Firewall
-    Enable tamper protection
-    Enable cloud-delivered protection
-    Turn on attack surface reduction rules and [Antimalware Scan
     Interface] for Office [Visual Basic for Applications].[26]

47.    Given that Defendant was storing the Private Information of Plaintiffs and Class
members, Defendant could and should have implemented all of the above measures to prevent
and detect cyber-attacks.

48.    The occurrence of the Data Breach indicates that Defendant failed to adequately
implement one or more of the above measures to prevent "hacking" attacks, resulting in the Data
Breach and the exposure of the Private Information of an undisclosed amount of current and
former consumers, including Plaintiffs and Class members.

---

[26] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:*
https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-
disaster/ (last accessed July 14, 2023).

***Securing Private Information and Preventing Breaches***

49.     Defendant could have prevented this Data Breach by properly securing and encrypting the Private Information of Plaintiffs and Class members. Alternatively, Defendant could have destroyed the data that was no longer useful, especially outdated data.

50.     Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class members was exacerbated by the repeated warnings and alerts directed to businesses to protect and secure sensitive data.

51.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class members from being compromised.

***Defendant Failed to Comply with FTC Guidelines***

52.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

53.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[27] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[28]

---

[27] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed July 14, 2023).
[28] *Id*.

54.     The FTC further recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

55.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

56.     Defendant failed to properly implement basic data security practices.

57.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

58.     Defendant was at all times fully aware of its obligation to protect the Private Information of Plaintiffs and Class members. Defendant was also aware of the significant repercussions that would result from their failure to do so.

***Defendant Failed to Comply with Industry Standards***

59.     Several best practices have been identified that at a minimum should be implemented by companies like Defendant, including but not limited to, educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices.

60.     Other best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

61.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

62.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards thereby opening the door to the cyber incident and causing the Data Breach.

***Value of Personally Identifiable Information***

63.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[29] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[30]

64.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen

---

[29] 17 C.F.R. § 248.201 (2013).

[30] *Id.*

identity credentials. For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[31] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[32] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[33]

65.     Theft of PHI is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

66.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

67.     According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[34]

68.     Moreover, the fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered,

---

[31] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed July 14, 2023).

[32] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed July 14 2023).

[33] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed July 14 2023).

[34] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed July 14, 2023)

and also between when PII and PHI is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[35]

69.     The PII and PHI ("Private Information") stolen in the Data Breach has significant value, as PII and PHI is a valuable property right.[36] Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[37]

70.     There is also an active and robust legitimate marketplace for PII. In 2019, the data brokering industry was worth roughly $200 billion.[38] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker, who in turn aggregates the information and provides it to marketers or app developers.[39] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[40]

71.     As a result of the Data Breach, Plaintiffs' and Class members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and

---

[35] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last accessed July 14, 2023).

[36] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets." (citations omitted)).

[37] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed July 14, 2023).

[38] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak* (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed July 14, 2023).

[39] *See, e.g.*, https://datacoup.com/; https://worlddataexchange.com/about (last accessed July 14, 2023).

[40] Computer & Mobile Panel, NIELSEN, *available at* https://computermobilepanel.nielsen.com/ ui/US/en/sdp/landing (last accessed July 14, 2023).

diminished by its unauthorized release to third party actors, to whom it holds significant value. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of Plaintiffs' and Class members' Private Information has been lost, thereby causing additional loss of value.

72.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class members, including patient names, cities, states, zip codes, emails, telephone numbers, dates of birth, genders, patient service dates, patient service locations, and next appointment dates, and of the foreseeable consequences that would occur if Defendant's data security system and network was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class members as a result of a breach.

73.     Plaintiffs and Class members now face years of constant surveillance of their medical and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

74.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s) and computer network, amounting to potentially tens of millions of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

75.     The injuries to Plaintiffs and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class members. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class members are long lasting and severe. Once Private Information is stolen, particularly medical information, fraudulent use of that information and damage to victims may continue for years.

## V.  PLAINTIFF-SPECIFIC ALLEGATIONS

*Plaintiff Peter Sandstrom's Experience*

76.     Plaintiff Sandstrom obtained medical care from HCA Florida West Surgical Specialists, which is owned by Defendant and one of the entities affected by the Data Breach.[41] To obtain this medical care, Plaintiff Sandstrom was required to provide his Private Information, whether directly or indirectly, to Defendant.

77.     Upon information and belief, at the time of the Data Breach—on or around July 5, 2023—Defendant retained Plaintiff Sandstrom's Private Information in its system.

78.     Plaintiff Sandstrom greatly values his privacy and Private Information, especially when receiving medical services. Prior to the Data Breach, Plaintiff Sandstrom took reasonable steps to maintain the confidentiality of his Private Information.

79.     Plaintiff Sandstrom is very careful about sharing his sensitive Private Information. Plaintiff Sandstrom stores any documents containing his Private Information in a safe and secure location. Plaintiff Sandstrom has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

80.     Since learning of the Data Breach, Plaintiff Sandstrom has spent additional time reviewing his medical information and statements. Since the date of the breach, he has spent approximately two hours reviewing his medical accounts and plans to spend more time monitoring his medical accounts and plans in the future.

81.     The Data Breach has caused Plaintiff Sandstrom to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has not been forthright with information about the Data Breach.

---

[41] https://hcahealthcare.com/about/privacy-update.dot (last accessed on July 14, 2023).

82.    Plaintiff Sandstrom plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his medical information and accounts as well as other accounts for any unauthorized activity. Plaintiff Sandstrom also plans to sign up for credit monitoring and identity theft protection services.

83.    Additionally, Plaintiff Sandstrom is very careful about sharing his Private Information. He has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

84.    Plaintiff Sandstrom stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

85.    Plaintiff Sandstrom has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Greg Marcisz's Experience*

86.    Plaintiff Marcisz obtained medical care from Good Samaritan Hospital in San Jose, California, which is owned by Defendant and one of the entities affected by the Data Breach.[42] To obtain this medical care, Plaintiff Marcisz was required to provide his Private Information, whether directly or indirectly, to Defendant.

87.    Upon information and belief, at the time of the Data Breach—on or around July 5, 2023—Defendant retained Plaintiff Marcisz's Private Information in its system.

---

[42] https://hcahealthcare.com/about/privacy-update.dot (last accessed on July 14, 2023).

88.     Plaintiff Marcisz greatly values his privacy and Private Information, especially when receiving medical services. Prior to the Data Breach, Plaintiff Marcisz took reasonable steps to maintain the confidentiality of his Private Information.

89.     Plaintiff Marcisz is very careful about sharing his sensitive Private Information. Plaintiff Marcisz stores any documents containing his Private Information in a safe and secure location. Plaintiff Marcisz has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

90.     Since learning of the Data Breach, Plaintiff Marcisz has spent additional time reviewing his medical information and statements. Since the date of the breach, he has spent time reviewing his medical accounts and plans to spend more time monitoring his medical accounts and plans in the future.

91.     The Data Breach has caused Plaintiff Marcisz to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has not been forthright with information about the Data Breach.

92.     Plaintiff Marcisz plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his medical information and accounts as well as other accounts for any unauthorized activity. Plaintiff Marcisz also plans to sign up for credit monitoring and identity theft protection services.

93.     Additionally, Plaintiff Marcisz has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

94.     Plaintiff Marcisz stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

95. Plaintiff Marcisz has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

*Plaintiffs' Injuries and Damages*

96. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members are presently experiencing and will continue experiencing actual harm from fraud and identity theft.

97. Plaintiffs and Class members are presently experiencing substantial risk of out-of-pocket fraud losses, such as medical accounts being opened in their names, medical fraud, medical bills opened in their names, and similar identity theft.

98. Plaintiffs and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class members.

99. Plaintiffs and Class members are also incurring and may continue incurring out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

100. Plaintiffs and Class members also suffered a loss of value of their Private Information when it was acquired by the cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

101. Plaintiffs and Class members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class members overpaid for a service that was intended to be accompanied by adequate data security but was not. Part of the price Plaintiffs and Class members paid to

Defendant and their affiliates was intended to be used by Defendant to fund adequate security of Defendant's computer property and protect Plaintiffs' and Class members' Private Information. Thus, Plaintiffs and Class members did not get what they paid for.

102.    Plaintiffs and Class members have spent and will continue to spend significant amounts of time to monitor their medical accounts and records for misuse.

103.    Plaintiffs and Class members have suffered actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.      Finding fraudulent medical account, medical billing, medical insurance, and medical services being claimed or opened in their name;

b.      Purchasing credit monitoring and identity theft prevention;

c.      Placing "freezes" and "alerts" with credit reporting agencies and medical information and insurance organizations;

d.      Spending time on the phone with or at a medical institution or government agency to dispute fraudulent charges and/or claims;

e.      Contacting medical institutions and closing or modifying medical accounts; and

f.      Closely reviewing and monitoring medical insurance accounts, bank accounts, payment card statements, and credit reports for unauthorized activity for years to come.

104.    Moreover, Plaintiffs and Class members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not

limited to, making sure that the storage of data or documents containing sensitive and confidential personal, and/or medical information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

105.     Further, as a result of Defendant's conduct, Plaintiffs and Class members are forced to live with the anxiety that their Private Information may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever. Indeed, their Private Information has already been posted and sold on a dark web hacker's forum thereby heightening the likelihood of such disclosure occurring.

106.     As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class members have suffered a loss of privacy and are at a substantial and present risk of harm.

## VI. CLASS ACTION ALLEGATIONS

107.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiffs bring this action on behalf of themselves and on behalf of all members of the proposed Nationwide Class (the "Class") defined as:

> **All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach reported to have occurred on or about July 5, 2023.**

108.     Plaintiff Marcisz also seeks certification of a California Subclass, defined as follows:

> **All individuals residing in California whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach reported to have occurred on or about July 5, 2023.**

109.     The Nationwide Class and California Subclass are collectively referred to herein as the "Class" unless otherwise stated.

110.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

111.    Plaintiffs reserve the right to amend the definition of the Class or add a Class or Sub-class if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

112.    **Numerosity**: The Class members are so numerous that joinder of all members is impracticable. Specifically, as of July 10, 2023, there are at least 11 million individuals who had their Private Information compromised in this Data Breach. The identities of Class members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

113.    **Commonality**: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

  a.  Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class members;

  b.  Whether Defendant had a duty not to disclose the Private Information of Plaintiffs and Class members to unauthorized third parties;

  c.  Whether Defendant had a duty not to use the Private Information of Plaintiffs and Class members for non-business purposes;

  d.  Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class members;

  e.  When Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class members that their Private Information had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class members that their Private Information had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class members;

k.  Whether Plaintiffs and Class members are entitled to actual damages, nominal damages, and/or statutory damages as a result of Defendant's wrongful conduct;

l.  Whether Plaintiffs and Class members are entitled to restitution as a result of Defendant's wrongful conduct; and

m.  Whether Plaintiffs and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach

114.    **Typicality**: Plaintiffs' claims are typical of those of other Class members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach.

115.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating Class actions, including data privacy litigation of this kind.

116.    **Predominance:** Defendant has engaged in a common course of conduct toward Plaintiffs and Class members, in that all the Plaintiffs' and Class members' data was stored on the

same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

117. **Superiority**: A Class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, treating this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

118. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

119. Likewise, particular issues under Federal Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

      b.  Whether Defendant's security measures to protect their data systems were

reasonable in light of best practices recommended by data security experts;

    c.   Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    d.   Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII and PHI; and

    e.   Whether adherence to FTC data security recommendations and measures recommended by data security experts would have reasonably prevented the data breach

120.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class members' names and addresses affected by the Data Breach. Class members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

121.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained in paragraphs 1 through 120.

122.    Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

123.    Defendant had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class members' Private Information.

124.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class members could and would suffer if the data were wrongfully disclosed.

125.    By assuming responsibility for collecting and storing this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

126.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair. . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

127.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or Class members.

128.    A breach of security, unauthorized access, and resulting injury to Plaintiffs' and Class members' Private Information was reasonably foreseeable, particularly in light of Defendant's inadequate security practices, including sharing and/or storing the Private Information of Plaintiffs and Class members on its computer systems.

129.    Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and Class members,

the critical importance of providing adequate security of that data, and the necessity for encrypting all data stored on Defendant's systems.

130.    Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class members. Defendant's misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included their decisions not to comply with industry standards for the safekeeping of the Private Information of Plaintiffs and Class members, including basic encryption techniques freely available to Defendant.

131.    Plaintiffs and Class members had no ability to protect their Private Information that was in, and probably remains in, Defendant's possession.

132.    Defendant was in a position to protect against the harm suffered by Plaintiffs and Class members as a result of the Data Breach.

133.    Defendant had and continue to have a duty to adequately disclose that the Private Information of Plaintiffs and Class members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

134.    Defendant had a duty to comply with the industry standards set out above.

135.    Defendant, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class members' Private Information within Defendant's possession.

136.     Defendant, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class members' Private Information.

137.     Defendant, through their actions and/or omissions, unlawfully breached their duty to timely disclose to Plaintiffs and Class members that the Private Information within Defendant's possession might have been compromised and precisely the type of information compromised.

138.     Defendant's breach of duties owed to Plaintiffs and Class members caused Plaintiffs' and Class members' Private Information to be compromised.

139.     As a result of Defendant's ongoing failure to notify Plaintiffs and Class members regarding the type of Private Information that has been compromised, Plaintiffs and Class members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

140.     Defendant's breaches of duty caused Plaintiffs and Class members to suffer from identity theft, fraud, loss of time and money to monitor their finances for fraud, and loss of control over their Private Information.

141.     As a result of Defendant's negligence and breach of duties, Plaintiffs and Class members are in danger of present and continuing harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes. Plaintiffs and Class members will need identity theft protection services and credit monitoring services for their respective lifetimes, considering the immutable nature of the Private Information at issue, which includes sensitive medical information.

142.     There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class members and the harm,

or risk of imminent harm, suffered by Plaintiffs and Class members. The Private Information of Plaintiffs and Class members was stolen and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information, by adopting, implementing, and maintaining appropriate security measures.

143.     Plaintiffs seek the award of actual damages on behalf of themselves and the Class.

144.     In failing to secure Plaintiffs' and Class members' Private Information and promptly notifying them of the Data Breach, Defendant is guilty of oppression, fraud, or malice, in that Defendant acted or failed to act with a willful and conscious disregard of Plaintiffs' and Class members' rights. Plaintiffs, therefore, in addition to seeking actual damages, seek punitive damages on behalf of themselves and the Class.

145.     Plaintiffs seek injunctive relief on behalf of the Class in the form of an order compelling Defendant to institute appropriate data collection and safeguarding methods and policies with regard to customer information.

<u>COUNT II</u>
**Negligence *Per Se***
**(On behalf of Plaintiffs and the Class)**

146.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained in paragraphs 1 through 120.

147.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies like Defendant of failing to use reasonable measures to protect Private Information.

148.     The FTC publications and orders also form the basis of Defendant's duty to the Class.

33

149.     Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Private Information and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information that it obtained and stored and the foreseeable consequences of a data breach of that data.

150.     Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

151.     Plaintiffs and Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

152.     Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and the Class members.

153.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

<u>**COUNT III**</u>
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

154.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained in paragraphs 1 through 120.

155.     Plaintiffs and Class members had a legitimate expectation of privacy to their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

156.    Defendant owed a duty to Plaintiffs and Class members to keep their Private Information confidential.

157.    Defendant intentionally failed to protect and released to unknown and unauthorized third parties the non-redacted and non-encrypted Private Information of Plaintiffs and Class members.

158.    Defendant allowed unauthorized and unknown third parties access to and examination of the Private Information of Plaintiffs and Class members, by way of Defendant's failure to protect the Private Information.

159.    The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and Class members is highly offensive to a reasonable person.

160.    The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class Members disclosed their Private Information to Defendant as part of their relationships with Defendant, but privately with an intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and Class members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

161.    The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

162.    Defendant acted with intention and a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that their information security practices were inadequate and insufficient.

163.    Because Defendant acted with this knowing state of mind, it had notice and knew its inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and Class members.

164.    As a proximate result of the above acts and omissions of Defendant, Private Information of Plaintiffs and Class members was disclosed to third parties without authorization, causing Plaintiffs and Class members to suffer damages.

165.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class members in that the Private Information maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiffs and Class members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and Class members.

**<u>COUNT IV</u>**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

166.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained in paragraphs 1 through 120.

167.    Defendant (through its providers) offered to provide services to patients, which are Plaintiffs and Class members, in exchange for payment.

168.    Defendant also required Plaintiffs and the Class members to provide Defendant with their Private Information to receive medical care.

169.    In turn, Defendant impliedly promised to protect Plaintiffs' and Class members' Private Information through adequate data security measures.

170.    Plaintiffs and the Class members accepted Defendant's offer by providing Private Information to Defendant in exchange for receiving Defendant's services, and then by paying for and receiving the same.

171.    Plaintiffs and Class members would not have entrusted their Private Information to Defendant but-for the above-described agreement with Defendant.

172.    Defendant materially breached its agreement(s) with Plaintiffs and Class members by failing to safeguard such Private Information, violating industry standards necessarily incorporated in the agreement.

173.    Plaintiffs and Class members have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

174.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

175.    Defendant's conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract.

176.    The losses and damages Plaintiffs and Class members sustained as described herein were the direct and proximate result of Defendant's breach of the implied contracts with them, including breach of the implied covenant of good faith and fair dealing.

## COUNT V
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

177.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained in paragraphs 1 through 120.

178.    Plaintiffs and Class members conferred a monetary benefit to Defendant by paying Defendant for its services.

179.     Defendant knew that Plaintiffs and Class members conferred a monetary benefit to Defendant when it accepted and retained that benefit.

180.     Defendant was supposed to use some of the monetary benefit provided to it from Plaintiffs and Class members to secure the Private Information belonging to Plaintiffs and Class members by paying for costs of adequate data management and security.

181.     Defendant should not be permitted to retain any monetary benefit as a result of its failure to implement necessary security measures to protect the Private Information of Plaintiffs and Class members.

182.     Defendant gained access to Plaintiffs' and Class members' Private Information through inequitable means because Defendant failed to disclose that it used inadequate security measures.

183.     Plaintiffs and Class members were unaware of the inadequate security measures and would not have provided their Private Information to Defendant had they known of the inadequate security measures.

184.     To the extent that this cause of action is pled in the alternative to the others, Plaintiffs and Class members have no adequate remedy at law.

185.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and

adequate measures to protect the Private Information of Plaintiffs and Class members; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

186.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

187.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds from the monetary benefit that it unjustly received from them.

**COUNT VI**
**California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56, *et seq.***
**(On behalf of Plaintiff Marcisz and the California Subclass)**

188.    Plaintiff Marcisz re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 120.

189.    Defendant is "a provider of health care," as defined in Cal. Civ. Code §56.05(m), and is therefore subject to the requirements of the CMIA, Cal. Civ. Code §56.10(a), (d) and (e), 56.36(b), 56.101(a) and (b).

190.    At all relevant times, Defendant was a health care provider because it had the "purpose of maintaining medical information to make the information available to the individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manager his or her information, or for the diagnosis or treatment of the individual."

191. As a provider of health care or a contractor, Defendant is required by the CMIA to ensure that medical information regarding patients is not disclosed or disseminated or released without patient's authorization, and to protect and preserve the confidentiality of the medical information regarding a patient, under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, 56.36, and 56.101.

192. As a provider of health care or a contractor, Defendant is required by the CMIA not to disclose medical information regarding a patient without first obtaining an authorization under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, and 56.104.

193. Defendant is a person licensed under California under California's Business and Professions Code, Division 2. See Cal. Bus. Prof. Code § 4000, *et seq*.

194. Plaintiff Marcisz and California Subclass Members are "patients" as defined in CMIA, Cal. Civ. Code §56.05(k) ("'Patient' means any natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains."). Furthermore, Plaintiff Marcisz and California Subclass Members, as patients and customers of Defendant, had their individually identifiable "medical information," within the meaning of Civil Code § 56.05(j), created, maintained, preserved, and stored on Defendant's computer network, and were patients on or before the date of the Data Breach.

195. Defendant disclosed "medical information," as defined in CMIA, Cal. Civ. Code

196. § 56.05(j), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). The disclosure of information to unauthorized individuals in the Data Breach resulted from the affirmative actions of Defendant's employees, which allowed the hacker to see and obtain Plaintiff Marcisz's and California Subclass Members' medical information.

197.     Defendant negligently created, maintained, preserved, stored, and then exposed Plaintiff Marcisz's and California Subclass Members' individually identifiable "medical information," within the meaning of Cal. Civ. Code § 56.05(j), including Plaintiff Marcisz's and California Subclass Members' names, cities, states, zip codes, emails, telephone numbers, dates of birth, gender, patient service dates, patient service locations, and next appointment dates, that alone or in combination with other publicly available information, reveals their identities. Specifically, Defendant knowingly allowed and affirmatively acted in a manner that allowed unauthorized parties to access and actually view Plaintiff Marcisz's and California Subclass Members' confidential Private Information.

198.     Defendant's negligence resulted in the release of individually identifiable medical information pertaining to Plaintiff Marcisz and California Subclass Members to unauthorized persons and the breach of the confidentiality of that information. Defendant's negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiff Marcisz's and California Subclass Members' medical information in a manner that preserved the confidentiality of the information contained therein, in violation of Cal. Civ. Code §§ 56.06 and 56.101(a).

199.     Defendant also violated Sections 56.06 and 56.101 of the CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information.

200.     Plaintiff Marcisz's and California Subclass Members' medical information was accessed, removed and actually viewed by a hacker and other unauthorized parties during and following the Data Breach.

201.    Plaintiff Marcisz's and California Subclass Members' medical information that was the subject of the Data Breach included "electronic medical records" or "electronic health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

202.    Defendant's computer systems did not protect and preserve the integrity of electronic medical information in violation of Cal. Civ. Code § 56.101(b)(1)(A). As a direct and proximate result of Defendant's above-noted wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiff Marcisz and the California Subclass Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia,

    a.  present, imminent, immediate and continuing increased risk of identity theft, identity fraud and medical fraud –risks justifying expenditures for protective and remedial services for which they are entitled to compensation,

    b.  invasion of privacy,

    c.  breach of the confidentiality of the PHI,

    d.  statutory damages under the California CMIA,

    e.  deprivation of the value of their PHI, for which there is well-established national and international markets, and/or,

    f.  the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

203.    As a direct and proximate result of Defendant's wrongful actions, inaction, omission, and want of ordinary care that directly and proximately caused the release of Plaintiff Marcisz's and California Subclass Members' Private Information, Plaintiff Marcisz and California Subclass Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiff Marcisz's and California Subclass Members' written authorization.

204. Defendant's negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiff Marcisz's and California Subclass Members' medical information in a manner that preserved the confidentiality of the information contained therein violated the CMIA.

205. Plaintiff Marcisz's and the California Subclass Members were injured and have suffered damages, as described above, from Defendant's illegal and unauthorized disclosure and negligent release of their medical information in violation of Cal. Civ. Code §§56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, which allows for actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorneys' fees, expenses and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class members, request judgment against Defendant and that the Court grants the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class members, including but not limited to an order:

    i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendant to protect, including through encryption, all data collected

through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiffs' and Class members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class members;

vi. prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures;

x. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi.   requiring Defendant to conduct regular database scanning and securing checks;

xii.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class members;

xiii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.   requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii.   requiring Defendant to implement logging and monitoring programs sufficient

to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined by a jury at trial;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: July 17, 2023.                    Respectfully Submitted,

*/s/ Alexandra M. Honeycutt*_____
Alexandra M. Honeycutt
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN LLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
T: (865) 247-0080
F: (865) 522-0049
ahoneycutt@milberg.com

M. ANDERSON BERRY (*pro hac vice* forthcoming)
*aberry@justice4you.com*
GREGORY HAROUTUNIAN (*pro hac vice* forthcoming)
*gharoutunian@justice4you.com*
BRANDON P. JACK (*pro hac vice* forthcoming)
*bjack@justice4you.com*
**CLAYEO C. ARNOLD
A PROFESSIONAL CORPORATION**

865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Facsimile: (916) 924-1829

*Counsel for Plaintiffs and the Putative Class*